UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

```
*******************************
                              )
DARREN GERBER,                )
              Plaintiffs      )
                              )
      V.                      )     Civil Action No.
                              )
3SCORE, INC. and              )
PAUL HODGE                    )
              Defendants      )
*******************************
```

**COMPLAINT AND JURY DEMAND**

PARTIES

1.   Plaintiff, DARREN GERBER ("Gerber"), is a natural person, a
     citizen of Massachusetts and resides at 15 West Street,
     Sharon, Massachusetts.

2.   Defendant, 3SCORE, INC. ("3Score") is a corporation duly
     organized and existing under the laws of the State of
     Washington with a principal place of business at 905 NW
     Corporate Drive, Troutdale, Oregon.

3.   Defendant, PAUL HODGE ("Hodge") was at all material times
     President of defendant 3Score and a citizen of the State of
     Washington.

JURISDICTION

4.   The plaintiff is a citizen of Massachusetts; defendant 3Score
     is incorporated under the laws of the State of Washington
     with a principal place of business in Oregon; defendant Hodge
     is a citizen of the State of Washington; and the amount in
     controversy, without interests and costs, exceeds the sum or
     value specified in 28 U.S.C. §1332.

5.   In or about July 2008, plaintiff discovered 3Score's
     existence through its website, which contained images of
     3score's products; the images were represented to be of

1

actual installations of 3Score's laser-etched murals; relying on the quality of the product as represented, plaintiff thereafter contacted defendant Hodge to inquire about defendant 3Score's business, which consisted of selling laser-etched tiles and glass.

6.    In response, defendant Hodge sent to plaintiff 3Score's specification sheet and brochure for a laser etching machine known as the "LTM-100 Plus".

7.    On or about July 11, 2008, defendant Hodge on behalf of 3Score proposed that plaintiff consider purchasing 3Score's laser system in order to become a dealer in 3Score's products, which included laser-etched glass and granite.

8.    In deciding whether to purchase the LTM 100 Plus from 3Score, plaintiff specifically asked defendant Hodge about (a) the quality of the etched image on a sample tile that 3Score sent to plaintiff and (b) the speed and output of production with the LTM 100 Plus, which plaintiff described as "critical" to his decision to purchase.

9.    On or about July 16, 2008, Hodge represented in an e-mail to plaintiff, that the LTM 100-Plus "produces 60 square feet per hour of [etched] glass".

10.   On or about August 9, 2008, plaintiff requested from Hodge "the sales contract for the LTM [100-Plus]" and Hodge promised to send a sales contract to plaintiff for plaintiff's review.

11.   On or about August 13, 2008, Hodge represented to plaintiff that (a) the LTM 100-Plus could etch a stone tile in three (3) minutes and (b) that 3Score did not "really have a sales contract" for use in the sale of the LTM 100-Plus; instead Hodge sent plaintiff a "Sales Order" that described the LTM 100-Plus and associated products that 3Score offered to sell plaintiff.

12.   Plaintiff decided to purchase the LTM 100-Plus and associated goods and services and in August 2008 traveled to 3Score's place of business in Troutdale, Oregon to complete the purchase.

13.   On or about August 25, 2008, Hodge on behalf of 3Score, noted on 3Score's invoice number 123938 receipt of a check for

2

$51,300 from plaintiff as part payment for the LTM 100-Plus and associated goods and services.

14.   The invoice numbered 123938 that Hodge receipted and gave to plaintiff on or about August 25, 2008, was one page, with nothing on the reverse side of the page.

15.   In or about October 2008, 3Score shipped the LTM 100-Plus to Massachusetts to plaintiff's place of business and sent a technician to assist in installation and start up.

16.   After receipt of and working with the LTM 100-Plus, plaintiff experienced problems with output per unit of time and inquired of Hodge on October 29, 2008 about time necessary to etch tile.

17.   On or about October 29, 2008, Hodge responded to plaintiff's inquiry by providing a data sheet to plaintiff which data sheet contained the settings for the laser to etch glass, stone and tile; the data stated the listed times for etching various types of glass, which are given in square feet per unit of time.

18.   Not one of the settings in the data sheet for glass etching that Hodge provided to plaintiff states a time of one (1) minute or less per square foot.

19.   Plaintiff worked with the LTM 100-Plus through October and November 2008 but had continuing problems with the quality of the etched image and the time required to etch various images.

20.   Plaintiff made known to Hodge and 3Score the problems with quality and production and 3Score, at its own expense, again sent its technician to Massachusetts to try and correct the problem in December 2008.

21.   Despite the technician's several days of work and adjustment on the LTM 100-Plus and the laser head, the LTM 100-Plus could not meet the image quality or production rates that Hodge and 3Score represented to plaintiff.

22.   On or about December 5, 2008, in response to plaintiff's request for information on 3Score's policy regarding reimbursement or credit from 3Score for supplying defective

glass tile, Hodge sent to plaintiff a copy of 3Score's "invoice terms".

23.  December 5, 2008 was the first time plaintiff ever saw or became aware of 3Score's "Terms and Conditions of Sale" and, as of December 2008, plaintiff understood those terms and conditions to apply only to the sale of defective glass tile.

24.  On or before December 9, 2008, plaintiff received information that the images of glass tile installations that 3Score published in its catalogs and on its website, upon which plaintiff relied in making his decision to purchase the LTM 100-Plus, were not actual representations of installed product created by the LTM 100-Plus, but were images that had been altered or digitally manipulated.

25.  On or about December 9, 2008, plaintiff wrote to Hodge asking about this image alteration and requesting images of installation of LTM 100-Plus created products that had not been altered in any way; and plaintiff informed Hodge that plaintiff felt obligated to include a disclaimer in all marketing materials, advising that some of the images in catalogs and on the website have been altered.

26.  In response, on December 9, 2008, Hodge represented that he would send plaintiff unaltered images of glass installations created with the LTM 100-Plus

27.  On or about December 11, 2008, Hodge wrote to plaintiff that 3Score did not have any unaltered images to send to plaintiff and admitted that (a) the images in 3Score's catalog and website were a "mix of real and not real images" and (b) the images were developed well before 3Score started selling laser-etched glass tile.

28.  On or about December 18, 2008, 3Score again sent its technician to Massachusetts to inspect and adjust the LTM 100-Plus in order to have it meet promised representations as to quality of image and production rate, which adjustments included returning the laser head to the manufacturer for adjustment and repair.

29.  On or about December 21, 2008 while the 3Score technician was at plaintiff's place of business in Massachusetts working on the LTM 100-Plus, the technician, acting within the scope of his employment with 3Score, stated in a phone conversation

with 3Score's main office that plaintiff overheard, that there were problems with the laser head and that 3Score knew of these problems before shipping the LTM 100-Plus but shipped it anyway.

30.  On or about December 29, 2008, with no solution to the problems of image quality and production rate, and having discovered that the images on 3Score's website and in the catalog were computer generated (and not images of actual installations as plaintiff had been induced to believe), plaintiff wrote to Hodge to state he wished to return the LTM 100-Plus and receive a return of the purchase price.

31.  In response on December 31, 2008, 3Score referred plaintiff to the "Terms and Conditions of the sale" of the LTM 100-Plus that was "part of [plaintiff's] original invoice".

32.  On January 5, 2009, 3Score sent to plaintiff a copy of the original invoice of sale and the "Terms and Conditions" that 3Score alleged had been delivered to plaintiff in August 2008.

COUNT I

33.  Paragraphs 1-32 are incorporated by reference as if here written out in full.

34.  On or about July 16, 2008, Hodge individually and as agent for 3Score represented to plaintiff that the LTM 100-Plus could produce sixty (60) square feet per hour of etched glass.

35.  On or about August 13, 2008, Hodge individually and as agent for 3Score represented to plaintiff (a) that 3Score did not have a sales contract used in connection with the purchase and sale of the LTM 100-Plus, and (b) that the LTM 100-Plus could produce etched granite (or stone) at "3 minutes per tile" [equal to 20 square feet per hour].

36.  By providing plaintiff with 3Score's catalogs of images and by publishing images on its website without notice or disclaimer that the published images were not photographs of actual installations of products created by the LTM 100-Plus, Hodge and 3Score represented that the LTM 100-Plus could produce those images on file, glass and granite.

5

37.  The representations of fact alleged in paragraphs 34-36 were
     materials to plaintiff's decision to purchase the LTM 100-
     Plus.

38.  3Score and Hodge made the representations in paragraphs 34-36
     to induce plaintiff to enter a business relation with 3Score
     and to purchase the LTM 100-Plus, which representations did
     induce plaintiff to purchase the LTM 100-Plus and influenced
     plaintiff's decision to enter a business relation with
     3Score.

39.  3Score and Hodge knew or should have known at the time they
     made the representations alleged in paragraphs 34-36 that
     those representations were false.

40.  3Score and Hodge knew or should have known at the time they
     made the representations in paragraphs 34-36 that those
     representations did not fully disclose all materials facts
     bearing on the issue of production output, quality of image
     and terms and conditions of sale concerning the LTM 100-Plus.

41.  As a direct and proximate result of 3Score's and Hodge's
     misrepresentations or material fact and their failure fully
     to disclose all materials facts, plaintiff was injured by
     being fraudulently induced to purchase the LTM 100-Plus and
     by expending time, money and effort in reliance on the
     misrepresentations.

WHEREFORE, plaintiff demands

    (a)  that the contract of sale of the LTM 100-Plus be
         rescinded;
    (b)  that defendants be ordered to retake possession of
         the LTM 100-Plus at defendants' sole cost;
    (c)  that 3Score return the purchase price plaintiff paid,
         with interest;
    (d)  that plaintiff's consequential and incidental costs
         and expenses caused by reliance on defendants'
         misrepresentations be determined and that he be
         awarded that amount plus interest and costs in
         judgment against both defendants, jointly and
         severally;
    (e)  such other, further relief as the court deems just.

COUNT II

42. Paragraphs 1-32 and 34-41 are re-alleged as if here written out in full.

43. Plaintiff and defendants were at all material times engaged in trade or commerce as heretofore alleged.

44. Defendants 3Score and Hodge used or employed unfair and/or deceptive acts and practices by misrepresenting material facts concerning the LTM 100-Plus and the terms and conditions applicable to the sale of the LTM 100-Plus as heretofore alleged, in violation of Massachusetts General Laws Chapter 93A, Sections 2 and 11 and the regulations promulgated thereunder, which violations include, but are not limited to:
    (a) utilizing a "deceptive warranty";
    (b) engaging in "false advertising";
    (c) making "general misrepresentations"; and
    (d) failing to disclose material facts, the disclosure of which may have influenced plaintiff not to purchase the LTN 100-Plus.

45. Plaintiff lost money and/or property as a result of the defendants' use or employment of the unfair and/or deceptive acts and practices heretofore alleged.

46. The defendants acted willfully and/or knowingly in making the misrepresentations and in failing fully to disclose all material facts.

47. The defendants' misrepresentations and failures to disclose occurred substantially and primarily in Massachusetts where plaintiff received them and acted on them and suffered damage as a result.

WHEREFORE, plaintiff demands:

    (a) that his actual damages be determined and awarded to him in judgment against both defendants, jointly and severally, plus interests and costs;
    (b) that his actual damages be trebled and that he be awarded that trebled amount in judgment on account of defendants' willful and knowing violation of G.L. c. 93A, §2;

7

(c) that he be awarded reasonable attorneys fees incurred in
    bringing this action;
(d) for such other, further relief the court deems just.

**PLAINTIF DEMANDS TRIAL BY JURY**

                              Darren Gerber
                              By his Attorney


Date: April 16, 2009          /s/ Miles Siegel
                              Miles Siegel
                              BBO # 461720
                              Ten Winthrop Square
                              Boston, MA 02110
                              milesiegel@juno.com
                              617-350-0100
                              Fax: 617-426-5251